IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

EDWARD ALBERT STENBERG,

        Plaintiff,

vs.

        Case No. 4:20-cv-10674
        Hon. Matthew F. Leitman
        Mag. Judge Anthony P. Patti

CORIZON HEALTH, INC., et al.,

        Defendants.

---

## PRISONER CIVIL RIGHTS SECOND AMENDED COMPLAINT

## JURY TRIAL DEMANDED

## SECOND AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

This is a § 1983 action filed by Plaintiff EDWARD ALBERT STENBERG, a prisoner in the custody of the Michigan Department of Corrections, alleging the violation of his Constitutional rights to receive medical care and right to protections against cruel and unusual punishment, and in support of this verified complaint, Mr. Stenberg states as follows:

## I. JURISDICTION

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 in that this civil action arises under the Constitution of the United States.

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a) (3) in that this action seeks to redress the deprivation, under color of state law, of rights secured by acts of Congress providing for equal persons within the jurisdiction of the United States.

## II. PARTIES

3. Plaintiff EDWARD ALBERT STENBERG (Plaintiff) was at all times relevant to this complaint a terminally ill prisoner confined by the Michigan Department of Corrections (MDOC) and housed at the following facilities, the Charles Egeler, Reception & Guidance Center hospice "C-Unit" and Dwayne Waters Health Center, and the Woodland Center Correctional Facility.

4. Defendant CORIZON HEALTH, INC. (Corizon) was at all times relevant to this complaint the medical services provider/contractor to the MDOC. This Defendant was responsible for providing medical care mandated by the medical community.

5. Defendant CHS TX, INC. (CHS TX), upon information and belief, is the transferee of assets from Corizon through a divisional merger under Texas law,

2

has common shareholders, executives, and managers as Corizon, performs the same or similar services as Corizon under Corizon's contracts, and its formation serves no purpose other than to act as an instrumentality for Corizon to evade liability, as such, is a mere continuation, alter ego, or successor of Corizon.

6. Defendant YESCARE, INC. (YESCARE), upon information and belief, is the transferee of assets from Corizon through a divisional merger under Texas law, has common shareholders, executives, and managers as Corizon, performs the same or similar services as Corizon under Corizon's contracts, and its formation serves no purpose other than to act as an instrumentality for Corizon to evade liability, as such, is a mere continuation, alter ego, or successor of Corizon.

7. For purposes of this Second Amended Complaint, CORIZON, CHS TX, YESCARE, AND TEHUM are collectively referred to as CORIZON.

8. Defendant RICHARD HARBAUGH, was at all times relevant to this complaint the Health Unit Manager (HUM) at the WCC. This Defendant was acting under the color of federal and state law. This Defendant has the direct responsibility for the prisoners assigned to the housing units under his management, which includes that all prisoner under his management receive

proper and timely medical care. This Defendant is being sued in his individual capacity.

9. Defendant DR. MARK COOKS, was at all times relevant to this complaint the Dentist assigned to the WCC. This Defendant is responsible for providing prisoners with proper and timely care in accordance with applicable standards. This Defendant was acting under the color of federal and state law. This Defendant is being sued in his individual capacity.

10. Defendant HALEE JORDAN, RN, was at all times relevant to this complaint a Nurse Manager at the Dwayne Waters Health Center. This Defendant was responsible for the supervision of nurse's and resident care aides who provide emergent and routine medical care to prisoners. This Defendant was acting under the color of federal and state law. This Defendant is being sued in her individual capacity.

11. Defendant Dr. Gregory Fuller, was at all times relevant to this complaint the Choices Program Head for Dwayne Waters Health Center, C -Unit and WCC. This Defendant was acting under the color of federal and state law. This Defendant is being sued in his individual capacity.

12. Defendant VAN DWAYNE BROWN, was all times relevant to this complaint a Residential Care Aide at the Dwayne Waters Hospital This Defendant was

responsible for routinely caring for prisoners on a daily basis. This Defendant was acting under the color of federal and state law. This Defendant is being sued in his individual capacity.

13. Defendant TONIA LAWSON, was an L.P.N. assigned to the Dwayne Waters Health Center. This Defendant was responsible for providing emergent and routine care to all prisoners under his/her care. This Defendant was acting under the color of federal and state law. This Defendant is being sued in her individual capacity.

14. Defendant ERICA HERMAN, was a Register Nurse assigned to the Dwayne Waters Health Center. This Defendant was responsible for providing emergent and routine care to all prisoners under his/her care. This Defendant was acting under the color of federal and state law. This Defendant is being sued in her individual capacity.

15. Defendant TANA HILL, was at all times relevant to this complaint a Nurse Practitioner assigned to "C -Unit" hospice unit at the Charles Egeler Reception & Guidance Center. This Defendant was responsible for providing emergent and routine care to all prisoners under his/her care. This Defendant was acting under the color of Federal and State law. This Defendant is being sued in her individual capacity.

5

16. Defendant Dr. ANKHIET TRAN, was at all times relevant to this complaint a Physician assigned to the WCC. This Defendant was responsible for providing medical care and treatment to prisoners. This Defendant was acting under the color of federal and state law. Upon information and belief, Dr. Tran is directly responsible or has supervisory responsibility for Mr. Stenberg's care at his current correction facility, Thumb Correctional Facility. This Defendant is being sued in his individual capacity.

17. Defendant MATTHEW KASPER is a nurse with Corizon Health, Inc., was at all times relevant to this complaint employed with Corizon Health, Inc. and working with physicians at WCC and Dr. Fuller of the Choices Program. This Defendant was responsible for the care provided to prisoners housed at this facility. This Defendant was acting under the color of federal and state law. This Defendant is being sued in his individual capacity.

18. Defendant KEITH PAPENCICK, M.D., is a medical doctor and during the relevant time worked as a utilization manager with Corizon Health, Inc. This Defendant was responsible for approving surgeries for inpatients, such as Plaintiff. This Defendant was acting under the color of federal and state law. This Defendant is being used in his individual capacity.

6

## III.    EXHAUSTION OF AVALIABLE REMEDIES

19.  The Plaintiff has exhausted all available state remedies through the prisoner/ parolee grievance process pursuant to MDOC Policy Directive 03.02.130 *"Prisoner/ Parolee Grievances* n. See Grievances attached and referenced in this Second Amended Complaint. (Exhibit 1 is a Summary of Grievances Sorted By Claim).

20.  Grievance materials, including final determinations, which confirm Plaintiff exhausted remedies through the grievance procedure prior to filing these claims are already in Defendants' custody, possession or control, so Plaintiff has not attached all records here.

## IV.    CLAIM I

21.  The Plaintiff was denied medical care when the MDOC and its agents lost the Plaintiff's dentures during a routine facility transfer and Defendant Cooks failed to provide a proper replacement, despite being instructed to do so in the grievance process.  This claim relates to the following Defendant:

   A.  Dr. Cooks, the dentist at WCC, had the responsibility to make the Plaintiff's dentures, per grievance RGC 18-06-1000-19Z.

   B.  Richard Harbaugh, the HUM, had the responsibility to make sure the information he provided in serious matters was correct.  He also had the

7

responsibility to run the Health Unit properly.

## STATEMENT OF FACTS

22. In December of 2017 the Plaintiff was being housed by the MDOC at the Lakeland Correctional facility known as "LCF".

23. On December 14, 2017, the Plaintiff was awakened at an early hour by Correctional Officers and told to get dressed because he had to report for a doctor's appointment at the health care building. The Plaintiff was not given time to wash up or properly prepare himself. He dressed in a hurry in order to comply with the Correctional Officer's instructions. In doing so, he did not put his dentures in. The dentures remained soaking in a wash tub in the Plaintiff's cell.

24. The Plaintiff was under the impression that this would be a routine visit to health care however, upon arriving he was placed in restrains for a transfer. The Plaintiff was transferred to and admitted into the Dwayne Waters Health Center. The Plaintiff did not return to LCF until March 2021.

25. Upon arriving and being admitted to Dwayne Waters Health Center (DWH) the Plaintiff informed the nursing staff that his dentures were still at LCF. The Plaintiff asked the nursing staff to call or contact LCF in some manner to request that his dentures be sent to DWH.

26. The Plaintiff has Hepatic Encephalopathy which is a condition that causes an excess of ammonia in the blood. Following the transfer to DWH, the Plaintiffs condition led to an enormous amount of ammonia to be built up in his blood which ultimately ended up in his brain. This caused the Plaintiff to be disoriented and unaware of his surrounds. The Plaintiff was extremely sick during this time and was not in his right state of mind.

27. Eventually, the Plaintiff was told that his property had arrived from LCF but his dentures were not in the property. Once the Plaintiff was lucid again, and well enough to read and write, kites were sent to medical, property and other concerned parties.

28. Months went by without the Plaintiff receiving a response or any other information regarding the Plaintiff's dentures. When the Plaintiff's kites were finally responded to, he was instructed to file a grievance concerning his dentures.

29. On May 17, 2018 the Plaintiff filed a grievance seeking to have his dentures replaced. The investigation at step I concluded that *"the grievant top denture was not in his property when it arrived from LCF[.]"* The respondents further held that the grievant was not in a medical condition to understand or recollect

what was done when he was admitted to DWH. The respondents contacted dental and informed them that it was at no fault of the grievant that he is missing his denture. (See Attachment: A) It seems it would have been very easy for dentists to make just the top plate.

30. The respondents summarized the step I grievance by requesting that the grievant be provided with a new top denture plate. From this it appears that at some point the respondents had possession or knowledge of where the Plaintiff's bottom denture plate was.

31. Following the response at step I, the Plaintiff submitted a health care request seeking the replacement of his top denture.

32. Health care responded by submitting an order that stated he had been scheduled for a dental exam on or about 7-6-2018 and that he would be placed on the prosthetic exam list where he would be seen in the order he was placed on the list.

33. The Plaintiff responded to this order and attempted to clarify that he was not a new prosthetic recipient and that he was simply seeking a replace denture for the top plate that the MDOC had lost during his transfer. The Plaintiff asserted that he should not have to wait and endure the process as if he were a new prosthetic recipient, which could be more than 1 year long. Health care

10

(dental) never responded to that kite.

34. After waiting for months, the Plaintiff sent another kite to health care (dental) on 10-26-2018, informing them that he had never been called out in July for his dental examination. The Plaintiff also informed health care that he was having pain in his jaw and that he had cracking in both his ears. This request also went unanswered.

35. After many more months of waiting without answers from health care, the Plaintiff was finally called out for a cast in the spring of 2019. On 6-21-2019, the Plaintiff tried on a set of wax impressions. During this appointment, the wax impressions did not fit well in the Plaintiff's mouth. This required the dentist to do a great deal of carving and adjusting, however, even after all this adjusting the impressions still didn't fit the Plaintiff's mouth. The dentist removed many teeth from the impressions but ultimately concluded that the impressions needed a good deal of work before a final cast could be made.

36. Shortly after this appointment, the Plaintiff was transferred to Woodland Center Correctional Facility (WCC).

37. On 8-28-2019 the Plaintiff was called out for the next round of fittings for the latest version of wax impressions. These impressions were ill fitting and the teeth were set at what seemed to be a 20 degree angle. The dentist, Dr. Cooks,

11

said he could not see a problem with the impressions, however, he did call a specialist who was a prosthodontist.

38. The Plaintiff does not recall what the prosthodontist's name was however, during the appointment with him many of the problems that Dr. Cooks couldn't solve were fixed immediately. The prosthodontist worked the Plaintiff for approximately 55 minutes making repeated adjustments until the wax impressions fit fairly well, functioned pretty well and looked decent and were fairly even. The prosthodontist then made the appropriate notes and mark ups for the final processing.

**Note:** *Dentures are made by female prisoners participating in the "Dental Technician Trainee" program at Women's Huron valley correctional facility in Ypsilanti. Michigan.*

39. Plaintiff was later called out to dental for an appointment with Dr. Cooks, where the Plaintiff was given impressions to try out. The impressions did not fit well and fit far different from the ones that the prosthodontist had adjusted. The teeth were set at an angle where the right row of teeth would meet before the left row of teeth when closing the mouth which caused the upper denture to shift out of place. The Plaintiff could not open his mouth without the denture falling out. During this appointment, the Plaintiff made Dr. Cooks aware of all these issues by demonstrating them. He opened and closed his

12

mouth very slowly to show how the teeth were hitting and how the upper plate was falling out.

40. Dr. Cooks informed the Plaintiff that if he did not approve these impressions then it would be a very long time before he received any dentures. The Plaintiff asserted that this would not make much sense because the dentures were essentially unusable without the adjustments and he would still have the same problems.

41. Several days after the Plaintiff's appointment with Dr. Cooks, on a weekend, Dr. Cooks and his assistant visited the Plaintiff in his room to inform him that they would not pursue his case any longer. The Plaintiff reminded Dr. Cooks that the dental department had been instructed to resolve the Plaintiffs denture issue following the investigation at step I in the grievance process, 2 years earlier. Dr. Cooks replied that he did not care and he was not going to make the dentures.

42. The Plaintiff wrote a grievance on 10-11-2019 seeking a redress of this issue, and offering a solution to the process by asking the MDOC to seek out an outside expert. Doing this would have the Plaintiff's dentures made in a matter of days. The respondents issued a response that the Plaintiff would have to cover the expert at his own expense if the MDOC would even allow him to

pursue the matter.

43. On 10-28-2019, the Plaintiff amended the issue raised in his grievance to include the fact Dr. Cooks was not going to do anything further for the Plaintiff and to reiterate the fact that he (the Plaintiff) was not responsible for losing his dentures in the first place, so it follows that he should not be responsible for covering the cost of replacing them. In addition, the Plaintiff also reiterated the fact that more 2 years had passed and this issue still hadn't been resolved.

44. The Plaintiff wrote several letters attempting to get this matter resolved, which led to a meeting with the WCC Administrative Assistant Paul Schreiber on 11-5-2019. The Admin Assistant asked the Plaintiff if he would meet with the prosthodontist again and try to get the dentures made. The Plaintiff agreed and the Admin Assistant issued a memo to document this resolution.

45. On 11-21-2019 the Admin Assistant issued another memo stating the same information as the previous memo but adding an erroneous statement from the WCC Health Unit Manager (HUM herein), Richard Harbaugh. The HUM asserted that the entire wait for dentures was caused by the Plaintiff.

46. The Plaintiff responded to this memo in writing and asserted that he was still waiting for an appointment with the prosthodontist. He had been told that there would be an appointment scheduled but had not received any additional

14

information from the dental department. The Plaintiff also explained how the information contained in the Harbaugh memo was incorrect and misleading.

47. On 12-16-2019, the Admin Assistant issued another memo, which still contained the inaccurate information put forth by the HUM and stated that there would not be an appointment scheduled with the prosthodontist, despite what the Admin Assistant had said initially on 11-5-2019.

48. The Plaintiff responded to the Admin. Assistant's memo reiterating the fact that the information contained in the memo was inaccurate and misleading. The Plaintiff insisted that HUM Harbaugh was misleading in the information that he had provided.

49. The Plaintiff restated the core issues being that the MDOC had lost his dentures and had not provided him with a suitable replacement in over 2 years, despite being instructed to do so following the grievance process.

50. The Plaintiff maintains that he has pursued every possible resolution. The Defendants named in this Claim I have failed to rectify the issue and as result, the Plaintiff lives in constant pain both physically and emotionally. This has caused the Plaintiff to be introverted and anti-social.

51. On November 5, 2019, the Plaintiff met with the Administrative Assistant, Paul Schreiber.  Mr. Schreiber asked the Plaintiff if he would meet with the

prosthodontist again and the Plaintiff replied he would gladly do so. The Plaintiff waited and on November 11, 2019, Mr. Schreiber sent the Plaintiff a memo quoting erroneous statements from HUM Harbaugh and said the prosthodontist would not be coming to see the Plaintiff again. The Plaintiff responded to the memo stating that the information from HUM Harbaugh was very incorrect, and if Mr. Schreiber would meet with him he would explain. Mr. Schreiber would not meet with the Plaintiff so the Plaintiff again responded telling Mr. Schreiber to look at the records himself. Mr. Schreiber and HUM Harbaugh never responded.

52. On 12-6-2019 the Plaintiff pursued the matter to step III of the grievance process under grievance identifier WCC-20 19-10-0515-12A2. (See Attachment: A)

53. The Plaintiff asserts that the Defendants named in Claim I have denied his serious medical need by refusing to provide him with a suitable replacement for the lost dentures. This has resulted in the unnecessary and wanton infliction of pain to the Plaintiff. Plaintiff also alleges that he has suffered irreversible gum and jaw damage from not having teeth for such a long period of time.

## STATEMENT OF CLAIMS

54. The Plaintiff's Eighth Amendment Rights were violated by the lack of medical care to his serious medical needs which constitutes the unnecessary and wanton infliction of pain.

55. Denial of humane living conditions due to not having dentures, not being able to see well, and being in non-stop pain has caused a sense of isolation, depression, anxiety, humiliation and extreme mental anguish.

56. There was, and continues to be, an unnecessary delay in making replacement dentures for the Plaintiff and now the refusal to make the dentures at all as they were ordered to do by the grievance process.

57. The dental department, including Dr. Cooks, knew or should have known that as a long-time denture wearer the Plaintiff's gums and jaws were at risk of wearing away from such a long delay. Indeed, the Plaintiff may have already suffered irreversible damage to his gums and jaws.

## RELIEF REQUESTED

58. An injunction ordering the MDOC to immediately take the Plaintiff to an outside denture expert acceptable to this Court and at Defendants' sole expense to be examined to see if he can even wear dentures at this time.

17

59. An injunction ordering the MDOC, including Dr. Cooks, to follow the advice of the expert if it be dentures or dental implants.

60. Compensatory damages to be established at trial.

61. Punitive damages to be established at trial.

62. Grant the Plaintiff all costs incurred by himself and his counsel.

63. Grant the Plaintiff any other damages the Court may feel are needed due to the Defendants' egregious behavior.

## V. CLAIM II

64. Defendants Brown, Jordan, and Corizon have denied the Plaintiff reasonable and adequate medical care despite Plaintiffs' clear and obvious needs, causing the Plaintiffs symptoms to be exacerbated. This claim relates to the following Defendants:

A. Halee Jordan, RN, is a DWH Nursing Supervisor who is responsible for the health and welfare of the Plaintiff.

B. RCA Brown is responsible for the welfare of the Plaintiff and any injury to Plaintiff or failing to assist Plaintiff while he was passed out on the floor is contrary to Brown's duties.

C. Corizon, as their doctors failed to treat the Plaintiff.

D. CHS TX and YesCare are responsible for Corizon's transgressions as its successor or alter ego. YesCare is also an alter ego of CHS TX.

## STATEMENT OF FACTS

65. The Defendants in this case have denied the Plaintiff medical care. The Plaintiff was experiencing significant pain, limited movement and swelling around his abdominal area. Beginning on 7-24-2018, while being housed at the DWC. The Plaintiff asked to see a Doctor on almost a daily basis. The Plaintiff fell down while trying to use the toilet in his room, which was about five feet from his bed and was unable to stand for more than a few seconds.

66. On 8-1-2018 Registered Nurses Donnelly and Waters examined the Plaintiff and ordered a urine specimen. Prior to the test being completed, RN Donnelly was assigned to a different ward and the other RN's did not follow up. The Plaintiff continued to ask for a doctor to no avail.

67. On 8-9-2018 the Plaintiff fell down every time he attempted to use the toilet, and on this day in particular he requested a doctor at noon, 2 PM and 2:30 PM. At approximately 3:30 PM, a Lieutenant did a round and the Plaintiff asked for his help getting from his wheelchair to the bed, as he could not get there on his own. The Lieutenant informed the Plaintiff that he would speak to a Nurse and get some help, but he could not help. No one ever came to help the Plaintiff.

19

68. The Plaintiff ended up passing out and falling from his wheelchair to the floor. He awoke to RCA Brown kicking him in the ribs and yelling at him to get up. The Plaintiff tried his hardest to get up but could not and felt as if his arms and legs would not work.

69. RN Giesz came in to help the Plaintiff, however RCA Brown held his arm in front of RN Giesz and insisted that the Plaintiff was able to do it himself and stated *"Make him do it himself"*. RN Giesz heeded RCA Brown's assertions and did not help the Plaintiff get up off the floor.

70. Eventually, RCA Brown provided the Plaintiff with a minimal amount of assistance and the Plaintiff was eventually able to crawl into the bed. By the time the Plaintiff was coherent and alert, it was about 5 PM. Dinner trays had been passed out and the Plaintiffs' tray was on his bedside table. The Plaintiff's roommate informed him that after he fell unconscious he'd called for a nurse to help. At some point, the dinner tray was delivered while the Plaintiff was laying on the floor, passed out. The Plaintiff also did not receive his scheduled medication at 4:30 PM, from LPN Whitney. It's likely that, LPN Whitney and RCA Brown observed the Plaintiff passed out on the floor much earlier.

71. RN Giesz instructed the Plaintiff to stay in bed and he was given a urinal to use. He was never able to see the doctor. He informed the night shift RCA

about everything that had transpired throughout the day and made it a point to show her his side, where he had been kicked. The RCA advised the Plaintiff to write a grievance on the matter.

72. On 8-10-2018 the Plaintiff talked to the night shift RN Meyers as the day shift had again done nothing for the Plaintiff and advised her that he needed to see a doctor. RN Meyers then called the doctor for the Plaintiff. Also on 8-10-2018 the Plaintiff's sister (Monica Rowe) contacted RN Jordan on the Plaintiff's behalf and made her aware of the Plaintiff's serious medical needs.

73. On 8-11-2018 Nurse Practitioner Liu came and examined the Plaintiff. NP Liu ordered blood work for the Plaintiff. During the examination NP Liu determined that the Plaintiff's liver and spleen were enlarged.

74. The Plaintiff's blood work was returned on 8-14-2018. It was determined that the Plaintiff was having significant health problems. The most significant finding in the blood work was that the Plaintiff's blood ammonia level was somewhere about 110 or 130. The normal range for blood ammonia level is 15-30. This is why the Plaintiff was experiencing unconsciousness and passing out so often. If the Plaintiff's ammonia level went much higher, he could have died. The following day 4 of the Plaintiff's medications were increased.

75. The Plaintiff filed a grievance concerning the denial of medical attention. Despite the Plaintiffs constant request's for medical assistance, RN Jordan informed Plaintiff that his E.H.R. (Electronic Health Record) from 7-24-2018 to 8-18-2018 did not document his requests for assistance, despite the fact that she herself had talked to the Plaintiff's sister and was aware of the problem. This became apparent on 9-7-2018 when the Plaintiff received the step I response to his grievance.

76. The Plaintiff has filed numerous grievances concerning this issue to no avail. Shortly after the events described above, the Plaintiff entered the Hospice program in C -Unit at RGC.

77. Plaintiff has submitted written grievances telling DWH that there is a major problem with requests for help not being noted, recorded or answered. All to no avail. See, Grievances RGC 1808 1615 28I; RGC 1808 01591 12d1; RGC 2019 0801633 28C.

## STATEMENT OF CLAIMS

78. In this matter, the Plaintiffs' Eight Amendment right to be free from cruel and unusual punishment has been violated by the lack of medical care to what is a clear and obvious medical issue. The result of this lack of medical care constitutes an unnecessary and wanton infliction of pain.

79. _Failure to Protect._ The Defendants failed to act on information that RCA Brown assaulted the Plaintiff and engaged in abusive behavior towards the Plaintiff that was unwarranted. This placed the Plaintiff at a substantial risk to be injured and violated his Eighth Amendment right to be free from cruel and unusual punishment.

80. The Plaintiff's Eighth Amendment Rights were violated by the denial of urgently needed medical care which constitutes the unnecessary and wanton infliction of pain. There was a denial and delay of medical treatment when the Defendant Corizon knew from the Plaintiff's history he had serious medical issues.

**RELIEF REQUESTED**

81. Plaintiff requests the following relief for Claim II:

82. As the denial/delay of needed medical care continues, the Plaintiff asks for a permanent injunction for an outside doctor to be appointed to promptly handle all aspects of the Plaintiff's continuing care. This doctor to be determined by the Court and all costs for transport and care to be paid by the MDOC/Corizon.

83. Grant the Plaintiff a permanent injunction requiring the MDOC and Dr. Tran to take the Plaintiff to a suitable medical facility other than DWH when urgent

care is needed. Any costs to be paid by the MDOC.

84. Grant the Plaintiff a permanent injunction requiring DWH to install a recording system to record all calls from the patients' rooms to the nursing desk. As the nurses constantly say, "There is no record of the patient requesting assistance." There is no other way for the patients to prove that they requested care that was not given.

85. Grant Plaintiff compensatory damages of $5,000 from Defendants Jordan and Corizon and $20,000 from Defendant Brown.

86. Enter the judgment for compensatory damages against CHS TX and YesCare as Corizon's successors or alter egos and against YesCare as CHS TX's alter ego.

87. Granting Plaintiff punitive damages of:

| | |
|---|---|
| Halee Jordan, RN | $20,000 |
| RCA Brown | $100,000 |
| Corizon (and CHS TX and YesCare) | $20,000 |

88. Grant Plaintiff and his counsel costs incurred.

89. Grant Plaintiff any other costs the court may feel are needed for the Defendants' egregious behavior.

## VI. CLAIM III

90. The Defendants in this claim denied the Plaintiff medical care and pain medication as scheduled. These Defendants also stopped administering pain medication to the Plaintiff for no just cause or reason. The Defendants at issue in Claim III are as follows:

A. Dr. Fuller is the Choices manager, and one of the stated goals of this program is to help ease the pain of the palliative care and hospice patients. He is responsible to help patients – not to cause them more pain without even an examination.

B. Tana Hill, NP, is responsible for the medical care of the Plaintiff at C-Unit. She must get her actions approved by Dr. Fuller.

C. Tonia Lawson, RN, medication nurse has the responsibility to bring the Plaintiff's medications per the doctor's orders.

D. Erica Herman, RN, medication nurse has the responsibility to bring the Plaintiff's medications per the doctor's orders.

E. Anhkiet Tran, MD, WCC. Dr. Tran has continuously denied the Plaintiff medical care when urgently requested. Dr. Tran also denied effective pain management. Dr. Tran could have done more for the Plaintiff but constantly told the Plaintiff that Corizon is not allowing him to do what he feels is best

and has shown the Plaintiff one email in regards to this from Matthew Kasper, RN of Corizon.

F. Corizon had a duty to ensure prisoners received medical care consistent with the Eight Amendment. CHS TX and YesCare are responsible for Corizon's transgressions as its successors or alter egos and against YesCare as CHS TX's alter ego.

G. Matthew Kasper, RN Corizon, has denied the Plaintiff pain medication because "he writes grievances."

## STATEMENT OF FACTS

91. Prior to being incarcerated the Plaintiff had liver disease and herniated disks in his neck and spine. Since his incarceration the Plaintiff's condition has greatly deteriorated. The Plaintiff now is continuing to have problems with his liver, spleen, pancreas and stomach.

92. In the last several years the Plaintiff has been admitted numerous times to St. Mary's hospital in Saginaw, McLaren Hospital in Lansing and DWH. The Plaintiff has had numerous surgical operations on his stomach and has also had his gall bladder removed.

93. While the Plaintiff was admitted to these hospitals outside of the MDOC, they routinely placed him on pain killers such as morphine for his entire stay.

26

94. In the summer of 2017, the doctors at LCF placed the Plaintiff on a small dose of narcotic pain pills after his condition worsened and he had been admitted to DWH several times.

95. In December of 2017, the Plaintiff was taken to DWH on an emergency basis and stayed there until October of 2018, when the Plaintiff was transferred from DWH to C-Unit for hospice care.

96. At C-Unit, the Plaintiff's pain medication was changed from 10mg Narco 4x to 10mg Oxycodone 4x by Dr. Fuller.

97. In the spring of 2019, the Plaintiff started to experience spells of passing out again and his pain increased greatly. After numerous requests the Plaintiff was seen by NP Hill at C-Unit on June 4th, 2019. NP Hill was very upset with the Plaintiff as she was under the impression that he had written a kite complaining about her. She made the following statement to the Plaintiff, "Can't you get it through your thickhead – YOU ARE DYING – there is nothing more we can do for you". She then told the Plaintiff that if he kept complaining his pain medication will be stopped.

98. The Plaintiff was able to show NP Hill the kite that was in question and explained that his complaint concerned the nurse in the records department not providing him with medical records when he requested them. At this point,

27

NP Hill seemed to calm down and allowed the Plaintiff to explain his side of things. He explained that he was aware of his state and that he may be dying, however, he could not understand why he was being made to die in such pain and he was simply seeking pain medication.

99. NP Hill informed the Plaintiff that she would talk to Dr. Fuller, who was the head of the Choices Program. The next day following the meeting with NP Hill, the Plaintiff started receiving two doses of oxy-contin pain medication in addition to the oxycodone. (Note contins are time released medications.)

100. The Plaintiff continued to experience significant pain however. The Plaintiff had spells where he would vomit multiple times daily and have diarrhea 15 to 20 times per day, every day. The Plaintiff experienced constant pain.

101. The Plaintiff requested to see a doctor on June 11th, 12th, 14th, 15th, and the 18th. The Plaintiff told the nursing staff that he felt as if he were drunk and asked them to check his ammonia levels, as his hepatic encephalopathy causes ammonia to build up on his brain. The Plaintiff also informed the nursing staff that he could see undissolved pills in his vomit and diarrhea. He also provided samples.

102. The Plaintiff informed the nursing staff that he suspected the oxy-contin was a "time released" medication which would explain why the pills were

28

undissolved in his feces and vomit. The Plaintiff expressed his belief that the pills were being flushed from his system before it could begin to work or have an effect on his pain. The nursing staff informed the Plaintiff that he would see a doctor the following day, but this never happened.

103. On June 19th, 2019 the Plaintiff passed out in his room after experiencing a burst of extreme pain as he tried to retrieve his ID card from the floor, where it had fallen. The Plaintiff lost consciousness while on the floor and woke up 3 hours later. He informed the custody staff that he needed emergency attention and he was taken to the health care department where a nurse examined him. The Plaintiff was told that the doctor would call him out the following day, but this never happened.

104. On June 21st, 2019, while the Plaintiff was being seen in the dental clinic, the corrections officer (C/O herein) approached the Plaintiff and stated that he didn't look right. He went on to state that he believed the Plaintiff should be taken to the ER and he proceeded to get the Plaintiff to the ER.

105. RN Donnelly, who knew the Plaintiff from his numerous trips the DWH, was in the ER that day and attended to the Plaintiff. While taking the Plaintiffs blood pressure, a doctor came into the room. The doctor held a stethoscope several inches from the Plaintiffs chest and made the statement *"So you are*

*Stenberg, well you look fine to me, when you return to C-Unit your pain meds will be stopped.*"

106. The doctor did not conduct a thorough exam or ask the Plaintiff any medical questions and when the doctor made the statement, the Plaintiff received it as a threat. It gave the Plaintiff the impression that if he continued to complain or raises issues with his treatment, then his pain medication would be stripped away.  The Plaintiff had not even requested to see this doctor.  He was there because the attentive C/O had realized he was very ill.

107. On or about June 22nd, the Plaintiff was experiencing significant pain late in the evening. The Plaintiff brought this to the attention of C/O Fusak who was working midnights. The Plaintiff asked that a supervisor be called and requested to be taken to the hospital but, C/O Fusak told the Plaintiff that there was nothing he could do for him. It is unknown if the Plaintiff's request was logged in the unit's log book as required by policy.

108. In the days that followed, the Plaintiff continued to ask the nursing staff to check his ammonia level and made additional requests to see the doctor.

109. On July 9, 2019 the Plaintiff was taken to temporary segregation (also known as "The Hole") at DWH, for a misconduct. He immediately asked the nursing staff to check his ammonia level, because of his history and condition. When

the level was checked it was found that his ammonia level was at 91 when the normal range is 15 to 30. This is high enough to make someone feel drunk and disoriented.

110. Following this incident, the Plaintiff continued to complain about the pain he was experiencing, especially where his pain medication wasn't being administered as prescribed. The Plaintiff should have been receiving oxy-cotin at morning and night med lines and oxy-codone 4 times a day as needed, at his request as long there were at least 5 hours between the doses.

111. The situation was so bad the senior sergeant made a written complaint against one nurse who would not give the Plaintiff his pain meds.

112. The Plaintiff had to request his pain medication frequently, and when doing so, it would take the nursing staff 4 to 5 hours to bring his medication. The Plaintiff made numerous complaints and was told by several different nursing managers that the policy was to bring medication within one hour following the patient's request.

113. RN Herman denied the Plaintiff medical care when she would not give the Plaintiff his pain medication. The medication nurse had missed the Plaintiff's meds several times that day and the Plaintiff for hours asked RN Herman to bring him his pain medication. As shift RN Herman could get the medications

31

for Plaintiff but she refused to do so causing the Plaintiff to go longer without his meds. When Plaintiff asked for a supervisor, as he was entitled to, she also refused to call the supervisor. Reference Grievance RGC 1908 1635 28E.

114. After Plaintiff made his complaints to the nursing manager, the nursing staff began to harass the Plaintiff in different ways. They would make nasty remarks when he used the emergency call button, they refused to answer the call button at times, and continued to delay and at times, deny the Plaintiff's pain medication despite his excruciating pain.

115. The only diagnostic testing done during this period was one x-ray, despite the suggestions made by St. Mary's and McLaren hospitals that the Plaintiff should have upper and lower GI exams at least every two years. The one x-ray did show that the Plaintiffs stool had become "ossified", despite the Plaintiff having constant diarrhea. For some reason, the Plaintiff's bowels were only moving fluid but leaving solid waste behind. The Plaintiff had to receive several enemas, however, this did not mitigate the pain

   Note: 3 Months later, while the Plaintiff was being housed at WCC, Plaintiff had an EGD that showed his stomach was inflamed, however, no testing was done on the Plaintiff's liver, spleen, pancreas or colon.

116. Following the Plaintiff's numerous complaints concerning his pain, the nurses not administering the pain medication when requested, and the fact that the oxy-contin was being flushed from his system by constant diarrhea, Dr. Fuller ordered PA Alford to stop all the Plaintiff's pain medication. Dr. Fuller has never actually examined the Plaintiff or seen him.

117. PA Alford refused to stop the Plaintiff's pain meds all at once as it would cause the Plaintiff to experience withdrawal symptoms, however, on 8-8-2019 PA Alfred did cut the Plaintiff's dosage in half which caused the Plaintiff to experience increased pain and discomfort.

118. On 8-12–2019, an order was issued to stop all of Plaintiff's pain medication. The Plaintiff filed an emergency grievance against Dr. Fuller seeking to have his pain medication restarted, however, this grievance was subjected to the normal process which forced the Plaintiff to endure months of pain while the process played out.

119. The doctor at WCC did eventually give the Plaintiff a different type of pain medication, however, this was in a lower dosage than before. The Plaintiff continues to be in nonstop pain, which has continued to increase over time. Beyond one basic ultrasound the medical staff has not taken any more diagnostic measures or made any attempts to address the Plaintiff's ongoing

33

pain.

120. At WCC, when the EGD examination was completed, it was determined the Plaintiff's pancreas was bad in addition to the inflammation in the Plaintiff's stomach and abdomen area.

121. The lack of medical care has persisted. The Plaintiff sought redress of this issue by filing a grievance on 10-21-2019. The grievance was against Dr. Ankehiet Tran and the WCC medical staff.

122. On October 19, 2019, the Plaintiff asked a P.C.A. (Prisoner Care Aide) to get the nurse. The Plaintiff was experiencing a great deal of pain in the upper right side of his abdominal area and was throwing up often, as much as every few minutes. RN Colwal got the nursing monitor RN Monita and upon returning the Plaintiff, they noticed that the Plaintiff had thrown up even more in the time that had elapsed.

123. RN Monita asked the Plaintiff how long had this issue been going on? The Plaintiff informed her that he had been experiencing this issue since about June. The Plaintiff provided RN Monita with the following information.

   o The Plaintiff kited to see that doctor on 9-14-2019 and 9-20-2019.

   o The Plaintiff was able to see the doctor on 10-4-2019 however Dr. Tran did nothing to assist the Plaintiff because the Plaintiff was

scheduled to see a stomach doctor.

o On 10-6-2019 the Plaintiff threw up 5 times and was in extreme pain. He was told that he would see the doctor but never did.

o On 10-7-2019 the Plaintiff spoke to the nurse again after throwing up in extreme pain 4 times.

o On 10-8-2019 the Plaintiff experienced that same thing and was told again that he would see the doctor, but never did. That Plaintiff always informed the nursing staff when he was in pain.

o On 10-9-2019 the Plaintiff spoke to the nursing staff again about the extreme pain in the upper right side.

o On 10-10-2019 the Plaintiff spoke to the nurse and told her that he had been passing out from the pain.

o On 10-11-2019 the Plaintiff awoke with a blood pressure of 150/168, which is very high for him. It was checked again at 148/185 at noon and in the evening the blood pressure dropped to 98/160 as he had been fighting extreme pain all day.

o On 10-15-2019 the Plaintiff was in extreme pain and throwing up all day. He pointed out a small amount of blood in his vomit to nurse Barton and Papazarian. They again told the Plaintiff he

35

would see the doctor the following day, but again the doctor did not see the Plaintiff.

- o On 10-19-2019 the nurse manager told the Plaintiff that he would see the doctor on 10-21-2019.

- o On 10-21-2019 the doctor was in the WCC infirmary unit but did not stop to see the Plaintiff.

124. On October 21, 2019, the Plaintiff filed a grievance (WCC 1910 00526 12C3) complaining about the medical care. The Plaintiff updated the grievance on 12-1-2019 to include a visit to the stomach doctor on 10-24-2019 and had an EGD on 11-4-2019, but the examination was limited and did not examine the liver or spleen which is where the pain was worst.

125. The EGD did show inflammation of the stomach and the HFA doctor recommended some medication changes, however, this never happened.

126. The Plaintiff continued to be in pain and around Monday, 12-23-2019 the pain reached its worst level yet and the Plaintiff was in the greatest amount of pain he had experienced yet. The Plaintiff asked to see the doctor this day. The Plaintiff saw a substitute (Dr. Schmidt) doctor a short while later who informed the Plaintiff that she would review his file and get back with him, but she never did.

127. On Friday 12-27-2019, the Plaintiff was in such extreme pain he begged the nurses to send him to the hospital. The nurses sent the Plaintiff across the hall from the infirmary unit to the clinic to see Dr. Schmidt again. The doctor poked at the Plaintiffs' abdominal area. She informed the Plaintiff that she wanted to review his chart again and would get back with him, however she never did. Following this the Plaintiff requested to talk to a medical supervisor but no one ever came to speak with the Plaintiff.

128. On 12-28-2019, the Plaintiff told the nurse that he was starting to blackout again from the pain. She responded to the Plaintiff with the following statement, "I looked in on you and you were sleeping. How could you sleep if you are in pain?" The Plaintiff informed her that he wasn't sleep, he was unconscious.

129. The Plaintiff filed a grievance under identifier WCC 2020 01 0009 12Z1 and asked for an emergency grievance hearing. The Plaintiff was asking to be sent to the hospital. The grievance was not acknowledged until 1-6-2020, approximately 9 days later. The grievance had a due date of 1-27-2020.

130. On 1-7-2020 the Plaintiff again requested that his grievance be heard as an emergency grievance with a 2-day turn around. This request was ignored once again and the Plaintiff's grievance was not reviewed as an emergency

grievance.

131. The Plaintiff has been experiencing significant and often debilitating pain for more than a year. The Defendants have not addressed the Plaintiff's serious issues with effective pain management and this amounts to cruel and unusual punishment.

132. The Plaintiff was at times so ill that he rarely got out of bed and all his requests for physical therapy were ignored so he was just wasting away.

133. Medical care at the MDOC is contracted from Corizon. All Corizon doctors, PAs and NPs have to get approval from Corizon for surgeries and diagnostics they want. Dr. Tran was not even allowed to give Plaintiff Tylenol 3 without getting approval from RN Kasper, a Corizon employee.

## STATEMENT OF CLAIMS

134. The Plaintiff's Eighth Amendment rights were violated by the denial of proper medical care for his serious medical needs which constitutes the unnecessary and wanton infliction of pain. There was a denial and delay of medical care when the Plaintiff has a history of medical problems and is in hospice. The Plaintiff complained about his lack of care and was retaliated against, constantly being threatened with, and the eventual stoppage of, his pain medication with no just reason.

38

## RELIEF REQUESTED

135. Plaintiff requests the following relief for Claim III:

136. As the denial of effective medical care continues, the Plaintiff asks for a preliminary and permanent injunction requiring the MDOC and Dr. Tran to take him to a suitable outside doctor to handle all aspects of the Plaintiff's medical care promptly. The costs and transportation to be handled by the MDOC or Dr. Tran.

137. Grant Plaintiff a permanent injunction requiring the MDOC to place call recording equipment in DWH on all wards and in the WCC infirmary so supervisors can monitor the nurses' behavior when patients call for assistance or meds.

138. Grant Plaintiff a permanent injunction requiring MDOC medical personnel to wear name tags with their name clearly visible and to give their name on the phone when asked.

139. Grant Plaintiff compensatory/punitive damages of:

| Defendant | Compensatory Damages | Punitive Damages |
|---|---|---|
| Dr. Gregory Fuller | $50,000 | $150,000 |
| Tana Hill, NP | $1,000 | $------- |

| Nurse Tonia Lawson | $15,000 | $50,000 |
| Nurse Erica Herman | $15,000 | $30,000 |
| Anhkiet Tran, MD | $30,000 | $100,000 |
| Matthew Kasper, RN | $50,000 | $250,000 |
| Corizon Health, CHS TX, and YesCare | $200,000 | $300,000 |

140. Grant the Plaintiff any other damages the Court may decide are due because of the egregious behavior of the Defendants.

141. Grant the Plaintiff costs for his and his counsel's expenses.

## VII. CLAIM IV

142. The Defendants in this claim have deliberately denied the Plaintiff adequate medical care by not providing the Plaintiff with the necessary surgical procedure to correct the cataract in the Plaintiff's right eye. The Defendants at issue in this claim are as follows:

A. Corizon.  Between the Plaintiff's medical conditions and his lost ability to see functionally, the Plaintiff must bend over to about six inches from whatever he is reading or writing causing extreme pain to his already damaged neck and back.  The cost-cutting of Corizon causes the Plaintiff much suffering physically and mentally and increases Corizon's profits.

40

B. CHS TX and YesCare. These Defendants are liable for Corizon's transgressions as its successors or alter egos and against YesCare as CHS TX's alter ego.

C. Dr. Papendick. Plaintiff understands that surgeries cannot be performed without the utilization manager's approval and that Dr. Papendick, as Corizon's utilization manager, continued to refuse Plaintiff's cataract surgery until on or before June 2021; Plaintiff received cataract surgery in that month.

## STATEMENT OF FACTS

143. During the spring/summer of 2017 while the Plaintiff was being housed at LCF the optometrist diagnosed the Plaintiff with cataracts in both eyes. The Plaintiff was also evaluated by an outside expert who agreed with the assessment.

144. Early in 2018, while the Plaintiff was at DWH, the Plaintiff was sent to an outside surgeon who performed surgery on the Plaintiff's left eye. He told the Plaintiff that both eyes had been approved and he would do surgery on the right eye in a couple of weeks after the left eye healed completely.

145. The Plaintiff did not receive surgery on his right eye until June 2021. The Plaintiff had an optometry appointment at DWH where the optometrist there informed him that his surgery had been denied. Plaintiff understands that

Corizon's utilization manager must approve surgeries and that its manager, Defendant Papendick, refused Plaintiff's surgery. Apparently, the reasoning for the denial was that Plaintiff could see well enough from one eye and would not be limited. The Plaintiff was given a pair of glasses in lieu of the surgery. The Plaintiff attempted to wear the glasses but ultimately returned them to the optometry department, as they were not usable.

146. The Plaintiff explained to the optometrist that he could not read with the glasses. He explained that he would lose focus every couple of words and would lose his place on the page. This was causing the Plaintiff to experience disorientation and headaches. Both the Plaintiff's bi-focal vision and distance vision were drastically different.

147. Following these complaints, the optometry department requested surgery for the Plaintiff again and also tried to give the Plaintiff another pair of glasses that was made with a thinner lens material in an effort to mitigate the Plaintiff's vision issues.

148. Corizon, upon information and belief, through Dr. Papendick, denied Plaintiff's surgery and his problems persisted. The Plaintiff even attempted to wear a patch over his right eye in an effort to curb the symptoms. This was to no avail.

149. Following this, in July of 2019, the Plaintiff was returned to DWH optometry where the head optometrist examined him and brought in an outside expert to examine the Plaintiff as well. The expert opined and concluded that the Plaintiff's right eye needed surgery to correct the issues he was having. The expert stressed that the Plaintiff's surgery was absolutely necessary, in order to resolve the issues.

150. The optometry department renewed its request for the Plaintiff to have surgery by submitting a 407 form for approval. The Plaintiff was told that there was no way that surgery could be denied. This was in July of 2019.

151. In September 2019, while the Plaintiff was housed at WCC the Plaintiff inquired about the status of his eye surgery and was told at that time the surgery had been denied as of August 2019. Dr. Papendick signed the form 407 to deny Plaintiff's surgery, but Plaintiff did not discovery this fact until he received records from MDOC in this litigation. On 9-6-2019, the day after being informed via memo that the surgery had been denied, the Plaintiff wrote a grievance (# WCC 1909 0441 28 E).

152. On 9-21-2019 the Plaintiff sent a kite to the grievance coordinator informing him that he had yet to receive anything that acknowledged the receipt of his grievance. On 9-26-2019 the Plaintiff received a reply from the grievance

43

coordinator indicating that the grievance was rejected as untimely.

153. Plaintiff examined his grievance and noticed he had mistakenly put the wrong date. The Plaintiff dated the grievance for 8-6-2019 instead of 9-6-2019.

154. The Plaintiff sought a step II grievance form and submitted it on 10–1-2019. In the step II, the Plaintiff explained that the date of 8-6-2019 was a typo and included a copy of the 9-5-2019 memo he received from the optometry department. This grievance was rejected on 10-15-2019 for raising "multiple issues", without the respondent articulating or explaining what those "multiple issues" were.

155. Following this the Plaintiff filed a step III grievance and also sent the warden a letter explaining the entire situation.

156. On 11-6-2019 the Plaintiff was sent to DWH optometry where he was seen by Dr. Lindsey. The doctor was a younger man and had never examined the Plaintiff before. The Plaintiff asked Dr. Lindsey if his job was to find a reason to reject and deny the surgery the Plaintiff needed so badly. To some degree, he indicated that this was true. The doctor also asked the Plaintiff if he would be willing to try contact lenses.

157. The Plaintiff informed Dr. Lindsey that he would be willing to try the contact lenses however, his Parkinson's disease and hepatic-encephalopathy which

44

causes him to shake uncontrollably would make it very difficult to put contact lenses in, especially without a good mirror. Dr. Lindsey seemed to understand this. At some point, Dr. Lindsey informed the Plaintiff that he had been seeing him at the request of the WCC optometrist.

158. At the end of November 2019, the Plaintiff submitted a kite to the Health Unit Manager inquiring about the status of the contact lenses and has yet to receive a reply or acknowledgment.

> Note: on 1-15-20 the Plaintiff was taken to DWH where contacts were tried on him. The Plaintiff could not get them in on his own, so the contacts were sent back to WCC with him, along with instructions for the nursing staff to teach him how to put them in. The contacts were taken by the WCC nursing staff and the Plaintiff has never seen them again. Dr. Lindsley informed the Plaintiff that if he could not learn how to put the contacts in, due to the Parkinson's and the hepatic encephalopathy, then the optometrist would have to resubmit him for surgery. To the best of the Plaintiffs knowledge, this has never happened and he continues to have issues with his vision.

159. The Plaintiff continues to have trouble focusing, disorientation when moving around and great difficultly when reading. The Plaintiff must literally hold whatever reading material he is reading very close to his face in order to read it. Prior to these issues with his vision, the Plaintiff would read books almost daily. Now whenever the Plaintiff reads, he suffers from searing headaches.

160. The Plaintiff was informed by MDOC employees in the medical department, that Corizon is responsible for approving the 407 forms that requests surgical procedures. Plaintiff easily meets the requirements for this surgery. This is a common surgery which many Medicare and Medicaid patients receive. Defendants Corizon and Dr. Papendick denied Plaintiff the surgery.

161. The Plaintiff continues to suffer from the Defendants' deliberate inaction and failure to provide adequate medical care.

## STATEMENT OF CLAIMS

162. The Plaintiff's Eighth Amendment rights were violated by the denial of effective medical care for his serious medical needs which constitutes the unnecessary and wanton infliction of pain. Several courts have ruled that reading is a major life activity and Defendants have denied the Plaintiff this right.

## RELIEF REQUESTED

163. Plaintiff requests the following relief for Claim IV:

164. Grant Plaintiff compensatory and punitive damages of:

| Defendant | Compensatory Damages | Punitive Damages |
|---|---|---|
| Corizon Health, CHS TX, YesCare | $100,000 | $500,000 |
| Keith Papendick | $100,000 | $500,000 |

165. Grant the Plaintiff any other damages the court may feel are needed.

166. Grant the Plaintiff any costs he and his counsel have incurred.

## REQUEST FOR EXEMPTION

The Plaintiff asks that this Court exercise its authority to exempt from collection under the State of Michigan Correctional Facility Reimbursement Act, being Mich. Com. Laws.§ 800.400, et set., the award of any damages, as the application of the Act would be an unconstitutional hindrance to the purpose of Congress in enacting the Federal statutes herein, where there would be no incentive of the State to regard Plaintiff's federal rights.

## RESTATEMENT OF JURY DEMAND

Mr. Stenberg restates his demand for a trial by jury.

Date: November 7, 2024

Respectfully submitted,
Brooks Wilkins Sharkey & Turco PLLC

By:   /s/ Michael R. Turco
Michael R. Turco (P48705)
401 S. Old Woodward Avenue, Ste. 400
Birmingham, Michigan 48009
(248) 971-1713
turco@bwst-law.com
Attorney for Mr. Stenberg

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I declare and verify under penalty of perjury

under the laws of the United States of America that the foregoing is true and correct

to the best of my ability.

Date:

Edward A. Stenberg #124629
Thumb Correctional Facility
FB-48
3225 John Conley Drive
Lapeer, Michigan 48444

49

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2024, I electronically filed the foregoing document with the Clerk of the Court using the electronic filing system which will send notification of such filing to all counsel of record.

By: /s/ Michael R. Turco
Michael R. Turco (P48705)
Brooks Wilkins Sharkey & Turco PLLC
401 S. Old Woodward Avenue, Ste. 400
Birmingham, Michigan 48009
(248) 971-1713
turco@bwst-law.com
Attorney for Mr. Stenberg